# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION

## DOCKET NO. 3:05-cv-00401-FDW

| | |
|---|---|
| AURA LABRÓ KARAGIANNOPOULOS, ) ) ) Plaintiff, ) ) ) vs. ) ) CITY OF LOWELL, ) ) Defendant. ) ) | **ORDER** |

THIS MATTER comes now before the Court upon Defendant's Motion for Summary Judgment (Doc. No. 69). Plaintiff has responded to Defendant's Motion, Defendant has replied, and the Court has heard oral argument in this matter. Having considered the materials submitted by the parties, and having heard oral argument, the Court is now prepared to rule upon Defendant's Motion. First, however, the Court must rule on a lingering discovery issue. Defendant has submitted an affidavit created by its expert, Nadine Bennett, a certified planner with Centralina Council of Government. Plaintiff contends that this affidavit contains supplemental material that has not been timely disclosed, contrary to the Court's Pretrial Order (Doc. No. 30). The Court agrees with Plaintiff. The affidavit of Nadine Bennett (Doc. No. 71) is therefore STRICKEN from the record.

## FACTUAL BACKGROUND

Plaintiff alleges in her Complaint that Defendant, the City of Lowell ("the City"), has

discriminated against her in violation of the Equal Protection Clause of the Fourteenth Amendment.[1] Specifically, Plaintiff alleges that, because she is a Hispanic,[2] the City intentionally "de-escalated" the zoning of her property at 901-905 North Main Street, Lowell, North Carolina ("the Property") in order to prevent her from operating a used car lot on that property. The purpose of this used car lot was to fund the Labró Spanish and English School ("the School"), an organization operated by Plaintiff in order to teach computer competency, Spanish, and English at no cost to students from low-income households. Plaintiff founded and began operating the School in June of 2001. (Compl. 2, Doc. No. 1; Colgate Aff. Ex. X, Doc. No. 74-8.) The City alleges that in 2003, prior to her purchase of the Property, Plaintiff inquired with Lowell City Manager Ben Blackburn about the zoning of the Property for the purpose of relocating the School to that site. (Blackburn Aff. 1, Doc. No. 72.) At oral argument Plaintiff disputed that this initial meeting ever took place, but her own submitted materials state that it did. In one of her exhibits, Plaintiff states, "In July 2003, Plaintiff went to see Mr. Blackburn . . . and told him that we would be buying the property in a few months." (Pl.'s Ex. 6 at 10, Doc. No. 85-4.) The City contends that during this meeting, Blackburn told Plaintiff that the Property was zoned C-2—a classification reserved for small, neighborhood, retail businesses—and that a private school was appropriate for that classification, but that a used car lot was not discussed. (Blackburn Aff. 1, Doc. No. 72.) Plaintiff's exhibit is similar in that only the School and its licensing were formally discussed, but Plaintiff adds that she told Blackburn, at the conclusion of the meeting, that she would be back to apply for a license to sell used cars. (Pl.'s Ex.

---

[1] The Complaint specifically says, "42 U.S.C. § 1985 Note 232 - Equal protection and privileges." As shall be discussed, Plaintiff's Complaint is more properly brought under 42 U.S.C. § 1983.

[2] Plaintiff is naturalized United States citizen, born in Managua, Nicaragua.

6 at 10, Doc. No. 85-4.) On July 2, 2003, Plaintiff submitted an application for a privilege license to operate the School on the Property. (Answer Ex. E-1, Doc. No. 7-6.) The City granted Plaintiff's application and, according to Blackburn, all subsequent applications for the School have been annually renewed without incident. (Blackburn Aff. 5, Doc. No. 72.)

Having established the School on the Property, Plaintiff required funding in order to provide her services without cost. Plaintiff's plan was to sell used cars from the Property in order to defray the cost of operating the School and also to enable her to provide college scholarships to her students. However, when she informally inquired of Blackburn whether a used car lot would be appropriate for the Property, he responded that its C-2 classification precluded such a use. (Pl.'s Ex. 6 at 35, Doc. No. 85-4; Blackburn Aff. 1, Doc. No. 72.) Defendant's evidence demonstrates that the Property was marked as C-2 on the official City of Lowell zoning map from at least 1997 up until the present time. (Colgate Aff. Ex. R, Doc. No. 74-5.) Plaintiff, however, claims that she bought the Property solely because she believed it was zoned C-3, basing her belief on previous owners' use of the Property.[3]

---

[3] At oral argument, Plaintiff also claimed that she relied upon the opinion of Sam Mitchem, her neighbor and a member of the City Council, that she could sell used cars on the Property. This argument, one of apparent authority based on Mr. Mitchem's place on the City Council, runs contrary to the City's zoning ordinances and North Carolina law. One councilman, acting informally and without the ratification of the whole Council, does not have actual authority to bind the City. Rather, a zoning amendment must be considered by the Planning Board, have a public hearing before the City Council, and then have a final decision rendered by the City Council. (Blackburn Aff. at 2, Doc. No. 72.) Under North Carolina law, "parties dealing with governmental organizations are charged with notice of all limitations upon the organizations' authority, as the scope of such authority is a matter of public record." Finger v. Gaston County, 631 S.E.2d 171, 174 (N.C. App. 2006) (quoting Data General Corp. v. County of Durham, 545 S.E.2d 243, 248 (N.C. App. 2001). Thus, claims of apparent authority and estoppel may not be used against a governmental entity. See Data General, 545 S.E.2d at 248; L & S Leasing, Inc. v. City of Winston-Salem, 471 S.E.2d 118, 120 (N.C. App. 1996).

On February 4, 2004, Plaintiff and her husband sent a letter to Blackburn requesting a zoning text amendment to sell used cars on the Property. In their letter, they stated that they were the new owners of the Property, which they recognized as "a commercial C-2 property," and asked that the City allow them to sell used cars on the Property based on its history of allowing used car dealerships there in the past. (Pl.'s Ex. 5 at 27, Doc. No. 85-3; Colgate Aff. Ex. G, Doc. No. 73-4.) On March 2, 2004, the City Planning Board met and expressed concern over the petition. Noting that "neighborhood businesses should be those that are primarily for the use of that specific and limited area," the Planning Board voted unanimously to recommend a denial of the petition to the City Council. (Colgate Aff. Ex. I at 1-2, Doc. No. 73-4.) On March 9, 2005, the City Council held a meeting in which Plaintiff informed the Council that she ran the School, that she and her husband had been remodeling it, and that the proposed zoning text amendment would allow her husband to sell cars to offset some of the costs of the School. (Colgate Aff. Ex. J at 4, Doc. No. 73-5.) Acknowledging the Planning Board's recommendation, the City Council voted to deny Plaintiff's petition for a zoning text amendment. (Colgate Aff. Ex. J at 4, Doc. No. 73-5.) Plaintiff does not allege that any disparaging remarks about her ethnicity, either explicit or implicit, were made by anyone at either the Planning Board or City Council meetings, nor does the Court's independent review of the minutes of those meetings indicate that any such ethnic animus was expressed.

In July of 2004, shortly after the City Council denied Plaintiff's proposed zoning text amendment, Plaintiff's husband was granted a privilege license to sell cars at 4502 Wilkinson Boulevard ("the Wilkinson Boulevard property") under the business name "Used Cars For Less." (Colgate Aff. Ex. K at 4, Doc. No. 73-5.) Plaintiff describes this property as being "a poor location

under lease." (Pl.'s Res. at 5, Doc. No. 87.) While operating his used car business from the Wilkinson Boulevard property, Plaintiff's husband stored cars on the Property. On August 18, 2004, Plaintiff's husband received a citation for storing "junk vehicles" on the Property. (Colgate Aff. Ex. K at 2, Doc. No. 73-5; Ex. L, Doc. No. 74-2.) Plaintiff's husband responded in a letter to the local police that the vehicles were not junk vehicles, but were simply being stored on the Property in connection with his used car lot on the Wilkinson Boulevard property. (Colgate Aff. Ex. K at 1, Doc. No. 73-7.) Shortly thereafter, Blackburn sent a letter to Plaintiff's husband informing him that the cars were improperly kept on the Property and that the sale of used cars was not permitted in a C-2 zoning district. (Colgate Aff. Ex. L at 1, Doc. No. 74-2.) On February 12, 2005, Plaintiff herself responded by stating that the cars were not being sold from the Property, but rather were being stored there for later sale at the Wilkinson Boulevard property. (Colgate Aff. Ex. M, Doc. No. 74-3.) Plaintiff went on to state that in granting a business license to the previous owner of the Property, Larry Morrow, who Plaintiff noted was a white man, the City had "established a new precedent and irrevocably amended that particular location's zoning ordinance from a C-2 to C-2 and C-3." (Colgate Aff. Ex. M, Doc. No. 74-3.) Plaintiff concluded by including a check and again requesting a personal business license in the name of "Used Cars For Less" with an address at 903 North Main Street, stating that she is "a Hispanic and a minority" and that she would file a discrimination lawsuit "in the event that you discriminate against me and refuse to issue me said license." (Colgate Aff. Ex. M, Doc. No. 74-3.) On March 24, 2005, Blackburn responded to Plaintiff by returning her check and reiterating that the Property was zoned C-2 and that automobile sales were not a permitted use within a C-2 zone. (Colgate Aff. Ex. N, Doc. No. 74-3.) Plaintiff responded on April 9, 2005, with another letter, outlining her belief that businesses had been

operating in a manner consistent with a C-3 zoning district for years under white male ownership and threatening a $200,000 lawsuit, once again stating, "refusal to issue me a license is discriminatory and an unlawful act" and reminding the City that she is "a Hispanic and a minority." (Colgate Aff. Ex. O, Doc. No. 74-4.) Not having obtained the zoning license she desired, Plaintiff filed her Complaint with this Court on September 19, 2005.

It is undisputed by the City that the Property was used for automobile sales from 1962 to 1990. Larry Gene Morrow purchased the Property in 1959, and according to Morrow it was "commercially zoned" and at that time "permitted the sale of automobiles." He operated a used car business under the name "Gene Morrow Auto Sales" on the Property from 1962 to 1980. (Compl. Ex. 2 at 2.) In 1980, Carl Mitchem leased the Property and operated a used car business for approximately four to five years. From 1978 to 1984, a pool hall named "Woodlawn Snack Bar & Game Room" was also located on the Property. Neither the City nor Plaintiff offer any evidence of the specific zoning for the Property for these early years, but Plaintiff alleges that all of the preceding businesses received annual business licenses from the City.

In 1985, Morrow sold the Property to Mark Gosnell, who on July 8, 1985, successfully petitioned the City to change the zoning of the Property from R-8 multifamily residential to C-2 neighborhood business.[4] (Colgate Aff. Ex. B, Doc. No. 73-2.) According to Gosnell's application,

---

[4]At oral argument, Plaintiff disputed whether Mr. Gosnell's application for re-zoning related to her property. She stated that, according to her reading of the City's Exhibit A, the property that was re-zoned was in reality 39 Lineberger Street. (See Summ. J. Hr'g Tr. at 23, June 9, 2008.) A careful look at Mr. Gosnell's application, however, reveals that 39 Lineberger Street is the "Address of the Applicant," or in other words, Mr. Gosnell's personal residence. On the other hand, "the property to be re-zoned" refers to specific lot numbers, which correspond on the accompanying map to the Property currently owned by Plaintiff and her husband. Plaintiff's contention that this information has been fabricated by the City is addressed below.

the reason for the re-zoning was his desire to conform the zoning of the Property to its "present use" as a neighborhood business. (Colgate Aff. Ex. A, Doc. No. 73-1.) Gosnell operated a car lot on the Property until around 1990, although it is unclear whether the business was properly allowed as a "nonconforming use" in the newly-zoned C-2 District or if the City simply did not enforce the zoning. From 1990 to 1991, Jim-Lyn's Laundry operated on the Property. From 1991 through 2001, Jack Sexton owned the property and operated a pottery manufacture and wholesale business under the name "JS Pottery." According to Plaintiff's evidence, wholesale businesses are only permitted in a C-3 District. However, in a letter dated April 30, 1991, from the City's Assistant Zoning Officer directed to "Whom It May Concern," pottery manufacturing and sales were deemed to be permitted in the C-2 Zoning District. (Colgate Aff. Ex. C, Doc. No. 73-2.) Beginning sometime in or around 1998, Sexton leased part of the Property to Scott Johnson, who operated a welding shop in the Property's open field. While the applications for privilege licences submitted by Sexton do not explicitly list welding as an activity to be conducted by his business, they do list the construction of "gates and fences" as an included activity and "Classic Iron Works" as an associated business. (Compl. Exs. 9, 10, Doc. No. 1-3.) The City has no record of an application for a privilege license by Johnson, who purchased the Property on March 7, 2001. However, his welding activities and equipment were visible from Main Street and a sign reading "Classic Iron Works" was displayed on the Property, which is only 1/10 of a mile from Lowell City Hall. Johnson purchased the Property on March 7, 2001, and continued his welding operations through January of 2004. He sold the Property to Plaintiff and her husband on October 15, 2003. Plaintiff and her husband allowed Johnson to remain on the Property until January of 2004.

Plaintiff has submitted an affidavit from Larry Simonds, former City Councilman from 1979-

85 and former mayor during the terms of 1991-93 and 1997-2001. In his affidavit, Simonds states that "the only reason that the City of Lowell has denied [Plaintiff] a C-3 Business License to sell used cars on her C-3 property is because she is a Hispanic; there is no other valid reason." (Compl. Ex. 1 at 6-7, Doc. No. 1-2.) Simonds also states that the City has been granting C-3 business licenses for that location for several decades. (Compl. Ex. 1 at 7, Doc. No. 1-2.) However, in his deposition, Simonds, who unsuccessfully ran for mayor in 2001, 2003, and 2005, admits to not having attended a City Council meeting, Planning Board meeting, or zoning meeting since 2001. (Simonds's Dep. 14-15, Doc. No. 70-3.) He also admits to a lack of knowledge of the current process for issuing zoning permits and amendments, and a lack of knowledge about the specific zoning for the Property. (Simonds's Dep. 48, 30-31, Doc. No. 70-3.) Nevertheless, Simonds asserts that he is able to give evidence on "[t]he City of Lowell's procedure in the issuance of its Business Licenses." (Comp., Doc. No. 1, Ex. 1 at ¶ 1A.) Finally, during his deposition, Simonds stated that "some of the council members don't want them to have a used car business there." When pressed as to what he meant by "them," Simonds clarified that he was referring to "[a]ny particular person. This doesn't necessarily mean these folks." (Simonds's Dep. 51-52, Doc. No. 70-3.)

Both Simonds's deposition and Blackburn's affidavit reference the denial of a privilege license for a used car lot to Dr. Charles Lowry, a white male doctor who has lived in the area for the past four decades. (Simond's Dep. 37-38, Doc. No. 70-3; Blackburn Aff. 4-5, Doc. No. 72.) Dr. Lowry wanted to sell automobiles on his property, which is zoned C-1—another district in which automobile sales are not allowed. Around September 2005, Lowry inquired with Blackburn about whether a used car lot would be permissible on his property, and was told that used car sales are not allowed on a C-1 property. (Blackburn Aff. 4-5, Doc. No. 72.) Blackburn then informed Lowry

about the procedure for applying for a zoning text amendment. Lowry applied for a zoning text amendment to sell automobiles on his property, but the City Council denied his application. (Blackburn Aff. 5, Doc. No. 72).

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the Court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, Plaintiff in this case, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Plaintiff "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

## ANALYSIS

Plaintiff's Complaint and subsequent filings suffer from one, overriding non sequitur, albeit an understandable one. Plaintiff's evidence shows that the Property, from 1962 to 2004, has been consistently used in a manner inconsistent with a C-2 zoning designation, but consistent with a C-3 designation. The City does not contest these facts, but rather has supplemented them with its own records. Based upon these prior uses of the Property, Plaintiff has drawn a conclusion that has some surface, common sense appeal: that the Property must be zoned C-3.[5] This conclusion, however, does not follow, and is, in fact, legally incorrect. Property designations that have been properly established by city ordinance do not change simply because previous owners have not complied with them. Nor can Plaintiff argue that the City is now estopped from enforcing its zoning regulations because it has not enforced them in the past. As the North Carolina Supreme Court has stated:

> In enacting and enforcing zoning regulations, a municipality acts as a governmental agency and exercises the police power of the State. The police power is that inherent and plenary power in the state which enables it to govern, and to prohibit things hurtful to the health, morals, safety, and welfare of society. In the very nature of things, the police power of the State can not be bartered away by contract, or lost by any other mode. This being true, a municipality can not be estopped to enforce a zoning ordinance against a violator by the conduct of its officials in encouraging or permitting such violator to violate such ordinance in times past. . . . [T]he law must be so written; for a contrary decision would require an acceptance of the paradoxical proposition that a citizen can acquire immunity to the law of his country by habitually violating such law with the consent of unfaithful public officials charged with the duty of enforcing it.

City of Raleigh v. Fisher, 232 N.C. 629, 635 (1950). Thus, Plaintiff cannot argue that the Property

---

[5]For example, at one point during oral argument, the Court asked Plaintiff how she thought the Property had become C-3, to which she responded, "Because before that since 1962 they had been operating C-3 businesses. . . . I just go by what had been done before. All the businesses that had been done before." (Summ. J. Hr'g Tr. at 18-19.) The Court pressed further on this point, stating, "So you admit that you have no evidence of it legally being zoned a C-3. You only have evidence of the fact it was used," to which Plaintiff responded, "Yes." (Id. at 19.)

has somehow become C-3 because of its previous use when the tangible evidence demonstrates that it is C-2. The City is well within its right, under North Carolina law and its own ordinances, to enforce its facially neutral and otherwise valid zoning ordinances. The Court understands the obvious frustration that Plaintiff must have felt upon being denied something that the City, either explicitly or tacitly, had granted previous owners. If Plaintiff had not been such a good citizen and played by the rules, bringing to the City's attention her desire to put a used car lot on the Property as required by city ordinance, the City might not have been the wiser. There is, however, no remedy for Plaintiff's frustration under North Carolina law. Plaintiff's claim, if it is to survive at all, cannot be that the City has somehow "de-escalated" the Property, a conclusion that simply does not follow from the facts presented, but rather that the City enforced its zoning ordinance in a way that violated Plaintiff's constitutional rights.

Although Plaintiff's Complaint purports to be based upon 42 U.S.C. § 1985, that section is inapplicable to the facts as Plaintiff has presented them. In order to establish a cause of action for "conspiracy to deny equal protection of the laws" under § 1985(3), Plaintiff must first prove "a conspiracy of two or more persons." Simmons v. Poe, 47 F.3d 1370, 1376 (4th Cir. 1995). As an initial matter, it appears that the intracorporate conspiracy doctrine prohibits Plaintiff's § 1985 claim as it has been alleged.[6] A conspiracy is an agreement between two or more persons, the object of which, in the case of § 1985(3), is to deprive the plaintiff of the equal enjoyment of rights secured by the law to all. Just as a corporation cannot conspire with itself, the City, a single "person" under

---

[6]Buschi v. Kirven, 775 F.2d 1240, 1251 (4th Cir. 1985) ("It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.")

-11-

§ 1985,[7] is similarly incapable of conspiring with itself.[8] Putting the intracorporate conspiracy doctrine aside, Plaintiff has provided no evidence concerning a "meeting of the minds" to participate in a "joint plan of action" or to concoct a "'single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences.'" Simmons, 47 F.3d at 1377-78 (quoting Lenard v. Argento, 699 F.2d 874, 882-83 (7th Cir.1983) abrogated on other grounds by Hensley v. Eckerhart, 461 U.S. 424, 436 n.11 (1983)). Plaintiff has not offered any evidence demonstrating this kind of a mutual understanding between two or more persons that would satisfy this "relatively stringent standard." Id. at 1377. Thus, the Court shall proceed to discuss 42 U.S.C. § 1983, which more appropriately addresses Plaintiff's Complaint.[9]

---

[7] See Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690-91 (1978) (holding that Congress, in enacting the Civil Rights Act of 1871, intended to include municipalities and other local government units in its definition of "persons").

[8] Rini v. Zwirn, 886 F. Supp. 270, 292 (E.D.N.Y. 1995) ("Intracorporate immunity has also been extended to the context of conspiracies between a public entity and its employees."); see also Zombro v. Baltimore City Police Dept., 868 F.2d 1364, 1371 (4th Cir. 1989) (observing that the Baltimore City Police Department, even if it were a person, "may not conspire with itself"); Savage v. North Carolina Dept. of Correction, No. 5:06-cv- 171, 2007 WL 2904182, at *16 (E.D.N.C. Sept. 29, 2007) (observing that the North Carolina Department of Correction, even if it were a person, could not "conspire with itself"); Orafan v. Goord, 411 F. Supp. 2d 153, 165-66 (N.D.N.Y. 2006), rev'd on other grounds sub nom. Orafan v. Rashid, No. 06-2951, 2007 WL 2875968 (2d Cir. Sept. 28, 2007) (holding that employees of the New York State Department of Correctional Services were incapable of conspiring together as a matter of law); Cameron v. Church, 253 F. Supp. 2d 611, 623 (S.D.N.Y. 2003) (holding that employees of Westchester County, New York, were "legally incapable of conspiring together").

[9] The Court notes its duty to hold pro se plaintiffs to less stringent standards of pleading than represented parties. See Haines v. Kerner, 404 U.S. 519, 520 (1972); Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985) (holding that a pro se plaintiff's difficulty articulating his grievance "need not detour the district court from resolving that which the litigant himself has shown to be his real concern").

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983. Because § 1983 imposes liability for violations of rights "secured by the Constitution," the first inquiry is "whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" Baker v. McCollan, 443 U.S. 137, 140 (1979). The Supreme Court has held that the equal protection of the laws under the Fourteenth Amendment is such a right. McNeese v. Board of Ed. for Community Unit School Dist. 187, 373 U.S. 668, 674 (1963). Plaintiff, however, has not articulated a specific *legal* theory of how her equal protection rights have been violated; she simply maintains that the City, in denying her a zoning text amendment and a privilege license to sell used cars, has violated her right to the equal protection of the laws. Thus, it being necessary to devise the legal theory behind Plaintiff's factual allegations, the Court will proceed under the framework that best fits the nature of those allegations: selective enforcement.[10]

Although selective enforcement has been called a "murky corner of equal protection law," LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir. 1980), the United States Court of Appeals for the

---

[10] Although claims of disparate impact may be more common in equal protection jurisprudence, that theory is inapplicable to the present situation. Plaintiff has not presented any evidence concerning other Hispanic individuals, or individuals of any other protected class, and thus has not shown that a facially neutral statute has had a disproportionately adverse impact on Hispanics or some other suspect class. Similarly, Plaintiff has failed to show any "governmental 'custom'" that has become so "persistent and widespread" that it now constitutes "permanent and well settled city policy." Monell v. Department of Social Services of City of New York, 436 U.S. 658, 691 & n.56 (1978). Her allegations only involve the City's decisions as they relate to her, her ownership and use of the Property, and previous owners' use of the Property. Thus, her theory must be one of selective enforcement.

Fourth Circuit appears to have adopted the LeClair standard. See Jetstream Aero Services, Inc. v. New Hanover County, No. 88-1748, 1989 WL 100644, at *1 (4th Cir. Aug. 15, 1989). That standard contains two elements: "First, plaintiff must establish that defendant[] treated [her] differently in applying the laws than it treated other similarly situated entities. Second, plaintiff must prove that defendant[] intentionally or purposefully discriminated against [her] in selectively enforcing the laws." Houck & Sons, Inc. v. Transylvania County, 852 F. Supp. 442, 452 (W.D.N.C. 1993); see also LeClair, 627 F.2d at 609-610; Jetstream Aero Services, 1989 WL 100644, at *1. Because most courts addressing selective enforcement have focused on the second element, see Houck & Sons, 852 F. Supp. at 452, the Court will address that element first.

In order to satisfy LeClair's intent element, Plaintiff must show that the City acted with an intentional, discriminatory purpose. As the United States Supreme Court has stated:

> "Discriminatory purpose," . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a [City Council], selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (U.S. 1979). Purposeful discrimination can be shown by circumstantial evidence, but such evidence must present a "'stark' pattern of adverse impact on a particular group." E & T Realty v. Strickland, 830 F.2d 1107, 1114 n.9 (11th Cir. 1987) (citing Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 266 (1977)). "Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause." Id. at 1114. In order to satisfy this element, Plaintiff must present either direct evidence that the City purposefully denied her application for a zoning text amendment because she is Hispanic, or circumstantial evidence demonstrating a stark pattern of discrimination

against Hispanics.

As direct evidence of purposeful discrimination, Plaintiff has produced the affidavit of Larry Simonds, former City Councilman and Mayor, who stated, "the only reason that the City of Lowell has denied [Plaintiff] a C-3 Business License to sell used cars on her C-3 property is because she is a Hispanic; there is no other valid reason." (Compl. Ex. 1 at 6-7, Doc. No. 1-2.) Mr. Simonds, however, provides no factual basis for this conclusory allegation. His service to the City ended in 2001, well before Plaintiff purchased the Property in 2003 and before the City Council denied her application for a zoning text amendment in 2004. Mr. Simonds has provided no evidence that he had any particular insight into the way Plaintiff's request for a zoning text amendment was handled by the Planning Board or the City Council. Furthermore, Mr. Simonds stated in his deposition that the City Council didn't single out Plaintiff and her husband based on any suspect classification, but rather didn't want "[a]ny particular person" at all to operate a used car business on the Property. (Simonds Dep. 51-52, Doc. No. 70-3.) Far from showing purposeful discrimination against Plaintiff based on her national origin, this statement demonstrates the City's current, reasonable decision to not allow anyone to operate a used car dealership on the Property. Mr. Simonds's statement, consisting of a legal conclusion without any factual support whatever, is insufficient evidence that the City purposefully discriminated against Plaintiff due to her national origin.[11]

Plaintiff's only other evidence of purposeful discrimination is the fact that the City failed to enforce the Property's zoning designation for the past forty-two years, but has chosen to do so now

---

[11]Cf. Cupples v. Amsan, LLC, No. 07-1403, slip op. at 7, 9 (4th Cir. June 10, 2008) (observing that the statement of a former vice president of defendant's human resources department was "virtually irrelevant" because, as a former corporate official, he was not privy to all the relevant facts).

that she owns the Property. From this fact, Plaintiff draws the inference that the City is discriminating against her because she is Hispanic. However, Plaintiff draws this inference without any additional substantiation. When pressed by the Court at oral argument as to what support she has for this inference, Plaintiff responded, "To me I think it's only common sense. . . . If I have seen from 1962 to January 2004 they have had C-3 businesses and there are all Caucasian men. Now I show up and they say it's a mistake." (Summ. J. Hr'g Tr. at 38-39.) Although it may seem like common sense to Plaintiff, the conclusion she draws must have a basis in fact if she is to survive summary judgment. In other words, Plaintiff "must do more than simply show that there is some metaphysical doubt" concerning the Property, its previous use, and the City's current desire to enforce its zoning regulations. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). As a single piece of circumstantial evidence, the City's history of enforcing its zoning ordinances fails to demonstrate a pattern of discrimination, let alone the "stark pattern" required by Supreme Court case law. See Village of Arlington Heights, 429 U.S. at 266. Simply put, no reasonable jury, having heard Plaintiff's evidence, could come to the conclusion that the City purposefully and intentionally discriminated against Plaintiff based on her national origin.

Because Plaintiff has not shown purposeful discrimination, the Court need not exhaustively address LeClair's similarly situated element. However, it appears that Plaintiff has also failed to satisfy this element. The City has presented uncontroverted evidence that Dr. Charles Lowry, a white male doctor, has also been denied a zoning text amendment to sell used cars on his property. (Blackburn Aff. 5, Doc. No. 72.) Viewing all the evidence presented by Plaintiff and the City, Plaintiff and Dr. Lowry are the only individuals who have recently petitioned the City for a zoning text amendment to sell used cars on property not zoned for such use. The City has denied

amendments to both Plaintiff and Dr. Lowry.[12] Thus, the only evidence of another, similarly situated individual demonstrates that the City is applying its zoning laws equally.

Plaintiff further rejects this conclusion by arguing that she has "observed several Caucasian residents in Lowell" (Pl's Resp. at 19, Doc. No. 87) who have received zoning text amendments. This bald-faced assertion, however, is insufficient to show that the City has treated similarly situated individuals differently. Were the individuals petitioning to sell used cars? What was the zoning designation of their properties? Plaintiff has not provided any additional facts or supporting documentation regarding these Caucasian residents and their zoning text amendments.

Furthermore, it became apparent at oral argument that Plaintiff has been relying upon tax maps and records in making her determination that the City allows Caucasians to violate zoning ordinances. (Summ. J. Hr'g Tr. at 64; see also Pl.'s Ex. 22 (a map from the Gaston County Office of the Director of Revenue), Doc. No. 85-7.) For example, Plaintiff repeatedly referred to a zoning designation of "single residential." (Summ. J. Hr'g Tr. at 51.) There is no such designation, but it appears that Plaintiff was referring to the tax status of certain properties. Thus, Plaintiff was referencing properties that had been taxed as single family residences but were subsequently used as something else. This fact, even when assumed to be true, does not shed light on the actual zoning of those properties. The highest zoning designation in the City is R-6. A property on a R-6 lot may be changed from a single family residence to a duplex (see Summ. J. Hr'g Tr. at 48-49) without any

---

[12]In her Response and at oral argument, Plaintiff contended that the denial of a licence to Dr. Lowry was "not an analogous comparison" because his property was C-1, rather than C-2. (Pl.'s Res. at 19, Doc. No. 87; see also Summ. J. Hr'g Tr. at 46.) Plaintiff's distinction is meaningless since it is not the specific zoning of a property that is important but rather the single issue of whether or not the zoning authorized the sale of used cars. In both Plaintiff's and Dr. Lowry's case, the zoning did not allow the sale of used cars, and both were treated equally by the City.

effect whatsoever on the property's zoning. In any event, it is clear that Plaintiff has failed to show different treatment of similarly situated individuals.[13]

Finally, the Court rejects Plaintiff's outlandish claims that the City and/or defense counsel fraudulently altered certain maps and zoning documents in an effort to deny Plaintiff and her husband a used car lot. Plaintiff has presented no expert, scientific evidence in support of her theories. Rather, she has referenced her Associate of Arts Degree in Interior Design, stating that this degree makes her an "expert draftsman." (Pl.'s Resp. at 8, Doc. No. 87.) An undergraduate degree in interior design, however, does not qualify Plaintiff as an expert in the drafting of metes and bounds, zoning maps and documents, or any of the allegedly fraudulent documents. In other words, Plaintiff has failed to present competent, expert testimony to support her serious and otherwise incredible claims, and the Court will not countenance them as such.

## CONCLUSION

Plaintiff's claim that her property has achieved C-3 zoning based on prior use is legally incorrect. Every tangible piece of evidence before the Court supports the fact that the Property is, and during the relevant time period has been, zoned C-2, and that a used car lot is an impermissible use in such a zone. The fact that the City did not enforce this zoning designation in the past does not estop it from current enforcement. The Court understands Plaintiff's frustration, and is sympathetic

---

[13]Plaintiff seems to argue that although she is not similarly situated to any contemporaneous individuals, she is similarly situated to the previous owners of the Property. (Pl.'s Resp. at 18, Doc. No. 87.) However, Plaintiff has presented no authority for the proposition that LeClair's similarly situated element can be satisfied by individuals who are not contemporaneous with the plaintiff, but are similarly situated in that they previously owned the same piece of property. Although "[t]here is no precise formula to determine whether an individual is similarly situated," Maulding Development, LLC v. City of Springfield, Ill., 453 F.3d 967, 970 (7th Cir. 2006), the Court is disinclined to create new law in this area given its dispositive conclusion on purposeful discrimination.

to her position, but the law simply does not support her claim that the City re-zoned her property. Furthermore, Plaintiff has been unable to show that the City's current enforcement is based on her ethnicity as an individual of Hispanic decent. Specifically, she has presented insufficient evidence to show that the City selectively enforced her property's C-2 zoning designation with an intentional, discriminatory purpose.

Accordingly, the Court holds that there are no genuine issues as to any material fact and that Defendant is entitled to summary judgment as a matter of law. Defendant's Motion is therefore GRANTED.

IT IS SO ORDERED.  Signed: June 13, 2008

Frank D. Whitney
United States District Judge